E-7-0-1-5-6 and 11-0-2-1-3, Dinesh Sheth and Sab Tool Supply Company. Both sides would step up and identify themselves. Good morning. Mark Belange on behalf of the appellants slash cross-appellees, Dinesh Sheth and Grinder International. Your Honors, good morning. My name is Irina Dmitrieva of Jenner and Block, and I'm here on behalf of defendants and cross-appellants, YG-1 Korea and certain of its affiliates and subsidiaries, and personally, YG-1 Korea President, Ho Kyung Song. How much time do you think you'll need, sir? A half an hour. Okay. And you? Well, the usual time, you know, 15 minutes for response to plaintiff's appeal and to talk about issues in our cross-appeal. But because, you know, we do have our own cross-appeal in this case, I would like to reserve up to probably five minutes in rebuttal time. Okay. Then let's proceed. Great. Thank you. Good morning to the distinguished panel. Once again, my name is Mark Belange representing the appellants, cross-appellees. I want to start with the statement that if you take the defendants' positions and arguments as true, my clients, Dinesh Sheth and Greiner's International, work for free. Why do I say that? Because the defendants take the position that my client, Dinesh Sheth, and my client, Greiner's International, did several transactions with the defendants and their companies for no fee, gratuitously. The evidence clearly demonstrates the opposite. Importantly, I first want to discuss the Regal Cutting Tools transaction. The Regal Cutting Tools transaction was a transaction in which Mr. Sheth was approached and discussed with Regal Belight, a Wisconsin corporation, the opportunity for Mr. Sheth to find a buyer for a cutting tools division. Its cutting tools division was not a separate company, but yet the defendants argue that under the Illinois Business Brokers Act, Mr. Sheth is not entitled to any commission because it was somehow an Illinois business. That is not the case. Mr. Sheth brought this opportunity to Mr. H.K. Hoken Song. He's the president of YG-1 Korea, as well as the sole shareholder of several affiliated related companies, South Tools, Premier Cutting Tools, Besley Cutting Tools. Mr. Song responded to this email inquiry from Mr. Sheth by stating, I authorize you to represent me. He didn't say anything other than me. And under the act, he was the individual who was hiring Mr. Sheth as a broker in the transaction. As a result, under the act, he was not an Illinois resident. He's a Korean national, and therefore, the act doesn't apply. Additionally, in the other aspect of the act, two elements, the requirement that the business being sold be an Illinois business, as I mentioned before, was not an Illinois business. The asset purchase agreement itself states clearly that the seller is Regal Beloit Corporation, a Wisconsin corporation. So the business being sold is a Wisconsin business. They didn't sell the whole corporation. They just sold their location in South Beloit, which is in Illinois. Everything was in Illinois. What was sold was in Illinois. That's not correct, Your Honor, because a portion of the assets were also based in South Carolina. That's right. And the purchaser of But we had something in Illinois. Some part of the assets, but I disagree, Your Honor. I believe that the definition of business is business and any part of the business being sold, and you looked at the domicile of who the seller is. Who's the seller? It's a Regal Beloit, a Wisconsin corporation. We're going to say that you looked at the domicile of the seller. But here, isn't it, the whole purpose is when it has to do with Illinois, something being sold in Illinois. I mean, North Carolina, you're not suggesting this because North Carolina is involved, too. The act doesn't apply. That's not what you're suggesting. So the question really becomes on what basis do you determine the situs of what's going on here. And I think it's clear when you look at the Schwed case, and I think it's clear when you look at the purpose of the act. It's to protect Illinois businesses selling and Illinois purchasers. And here we have a Wisconsin seller, Regal Beloit. That's what's identified in the asset purchase agreement. It's selling not some separate company wholly owned subsidiary. It's selling part of its assets, roughly 2% of its assets as a Wisconsin corporation. It's selling all of what was in Illinois. It didn't sell all of what was in Illinois because the real estate was owned by Regal Beloit, and that was sold to another LLC in the transaction. In the transaction. Correct. But not part of this transaction, and for which we're not claiming a commission. So the argument that they have that the Real Estate Licensure Act applies is a red herring. It does not apply because we're not claiming any commission whatsoever related to the sale of real estate either in Illinois or in South Carolina. And as a result, Mr. Sheff did all the due diligence. He was authorized by Mr. Song to do that. He negotiated a majority of all of the terms. The only time Song got involved was at the very end of the case situation where he came in and negotiated a lower price, but a lower price based on the fact that he decided to take on additional liabilities, which were originally not part of the deal, mainly environmental and some insurance. So the price was lowered. How do you interpret the Business Brokers Act statement that when the company or business sought to be sold has its principal place of business in this state? How would you interpret that language? The principal place of business is not within the state. The principal place of business is white Wisconsin. No, it says when the company or business sought to be sold. It doesn't say the seller. It says the company or business. So by saying business, doesn't that mean assets necessarily? It doesn't mean the company. It says the business. It must be something different than the company. I disagree. What do they mean then? What do they mean when they're talking about the business being sold? I believe they're referring to a majority of what the business is being sold, not just some piece at some part at some time. Well, what's the difference between a business and a company? A company obviously selling itself as a stock sale or asset sale of all of its assets. That's not what's happening here. We have a principal place of business for purposes, I believe, of the act in interpretation, again, being Wisconsin. There was not a separate business address for the cutting tools division other than it had a separate locale, but its principal place of business for all aspects of the running of the cutting tools division is located at the principal place of business. And that's what the act says, the principal place of business. The principal place of business is Beloit, Wisconsin. Well, it says the business sought to be sold. The business being sought to be sold is a division of Regal Beloit, which is located in Beloit, Wisconsin. It did not conduct business with its own address. It did not conduct business as a wholly owned subsidiary. It did no business on its own, and there's no evidence in this case, nothing in the record in this case that demonstrates that this was a separate locale having its own business address, conducting its own business, separate and apart from Regal Beloit, and the asset purchase agreement identified as the seller. Given that, it's our position, and I think it's clear that the CITUS, the principal place of business, the domicile for purposes of this act, is Beloit, Wisconsin. But didn't your client even state in a, I think it was in a correspondence, if I'm not mistaken, that the business was headquartered in South Beloit? Not the business. Well, what did your client say? Our client would say the Regal Beloit Cutting Tools Division had operations in South Beloit. There's no question about that. It also had operations in South Carolina, and its principal place of business where the negotiations were conducted, where the asset purchase agreement identifies the seller to be, is Beloit, Wisconsin. And going to the second element regarding the argument by defendants that Regal Cutting Tools was the purchaser has no merit. Regal Cutting Tools was not formed until four months after this transaction began. The person who is retaining the services of Mr. Schaff is Mr. H.K. Song, pursuant to the email which is in the record and included in the briefs in the appendix, which basically states, I'm retaining you, Dinesh, and it's me, me, H.K. Song, who is the individual who is retaining the services. There's no question, there's no dispute that Mr. H.K. Song is a Korean national. So based on both of those, we believe that the act is inapplicable. Now going to the further argument by defendants that there was no evidence of a reasonable value of services rendered, thus can't find in Dinesh's favor on appeal. As we know, the trial court, which this was an equitable claim so it wasn't to the jury, the trial court found that there was no evidence of the reasonable value of services rendered by Mr. Schaff. And defendants rely on the Bernstein case. The Bernstein case is their seminal case they believe that deals with this issue and requires that you find in their favor. We disagree. The Bernstein case deals with an entirely different area of business, principally lawyers. In that case, two lawyers left the firm. A lawyer who remained at the prior firm filed suit claiming he was entitled to a quantum merit for the cases that were taken by the lawyers and any recovery they got on those cases. And the trial court in that case found that he in fact, Mr. Bernstein, was entitled to 10% of whatever those fees were on a quantum merit basis. It was reversed on appeal. Reversed on appeal because Mr. Bernstein could show nothing other than answering some interrogatories or having been involved at some level in the initial contact with clients, having done any work whatsoever. He had no timesheets. He had no evidence of any work being done. And in the fact that the legal business is mostly done on an hourly basis with timesheets and information indicating these services rendered on behalf of that client, the appellate court reversed and said there's no evidence of any services rendered much less a reasonable value to what those services are. The 10% is arbitrary. And as a result, it reversed. The cases we rely on, which are the Romanet, Ellis, and Edens cases, I believe are far more illustrative to this court as to what the reasonable value of the services that were rendered. All of those cases deal with real estate brokers being the procuring cause of a deal at some point being cut out of that deal and then suing to get what we say a finder's fee for being the procuring cause. In each and every one of those cases, the court did find that that individual broker was the procuring cause. And because in that business the commission to be paid is based on a percentage of the assets being sold, the real estate being sold, that it was fair and reasonable to assign a percentage to whatever the assets are sold as the quantum merit amount to be awarded to the plaintiffs in those cases. And that's exactly what we're saying is the case here where Mr. Sheff, again, brought the deal in. And there's ample evidence in this case. It's demonstrated in the briefs, in the appendix, of all the services that were provided by Mr. Sheff, which are admitted to by the defendants. They admit he brought us the deal. They admit he was our representative who went through in great detail and did the due diligence, visited the various sites, did the negotiations, handled and was the point person. The lawyer, in fact, John Cummings, the lawyer retained at the very end to close the transaction, also testified that his contact person was Dinesh Sheff. His only contact person until the very end was Dinesh Sheff, that he worked with Dinesh Sheff. But there's not one piece of paper that says how much the commission was expected to be. It was an oral agreement, just like in the previous. But where in the record is there anything that says what that percentage would be? Even the evidence, as I understand it, could be anything from 0% to 10%. The evidence in this case is the testimony of Dinesh Sheff, where he testified explicitly that his deal with Mr. H.K. Song on this transaction was 10%. Right. And the court doesn't have to believe that if it doesn't like it. Understood. But clearly there was an agreement because Mr. H.K. Song even says in his cross-examination that I would have paid Mr. Sheff for the transaction. I was going to pay him $30,000, but I didn't pay him because he wouldn't sign this letter of confirmation that we had presented to him on other aspects of the relationship, which falsely, falsely identified the amounts due and owing the Grinders Company so that Mr. H.K. Song could have a reduction in monies due and owing pursuant to this letter of confirmation being signed. Because Dinesh refused to sign this false document, what do we have instead? We have Mr. H.K. Song saying I'm not going to pay him anything. I was going to pay him $30,000. So he puts a value on it, which clearly shows there's an agreement that Mr. Sheff isn't doing it for free and that there's an agreement that there's going to be compensation. Well, there may have been, but what that amount was, apparently there was no agreement if you believe that. Well, I would ask the Court to set aside the H.K. Song testimony because it's not believable. It's not believable given the fact that there's 200, 250 transactions over many years, $30 million of total transactions that are done where Mr. Sheff has paid on all of those transactions, and yet now we have a situation where he's doing this all for free? Well, on what basis could we as an appellate court set that aside, that testimony? Don't we give the deference to the trial court's credibility determinations? You do. And I find that when you look at the totality of the circumstances, and it goes back to my opening thing, my opening thing being the defendant's position that Dinesh did the Bessley transaction as a secret deal is not accurate, that he did the Regal deal for free is not accurate, that on the Saab tools that he loaned money to Saab tools and wasn't repaid, but it was just a gratuitous wiring of money to a company just because, it's not credible. The only credible version of events that is set out in the record, and which I believe requires under the quantum merit, the Bessley transaction, the Saab transaction, that the evidence in the case shows that the findings, which were the jury verdict and then the judgment entered on that, were against the manifest way to the evidence. When we go down to, so in sum, on the Regal cutting tools, Mr. Sheth did not agree to do it for free. He agreed to do it for 10%. He proceeded to do all of what was asked of him. There's no question he was the lead person. There's no question he brought the deal. There's no question that at the end of the day there was an agreement that he would be paid. Defendants say $30,000. We say 10%. We believe the Romanak, the Edens and Ellis case, which all set a percentage commission-based, and it's interesting, the Romanak case also finds the 10% is the commission that was applicable in that case, as it was, in that case, a standard of the industry on the sale of assets on a finder's fee basis. That we would ask that the trial court's judgment be reversed as against the manifest way to the evidence. If it were remanded for that purpose, we would be saying that, okay, he didn't do it for free. Figure out some compensation for the transaction. And the trial court basically said, I heard the testimony. I'm not persuaded by the 10% commission, and I don't know if $30,000 was proper, so I'm not comfortable with doing anything because I don't have a basis for awarding any amount of money. So what do we do, reopen for a new trial on damages? Yes. Yes. Then we go to count one, which actually ties in because it's an alternative pleading as to the count two, which is the oral agreement on the regal cutting tools, which is the same arguments. I'm not going to belabor those points. On the best way cutting tools transaction, there's two aspects to this. We have our argument that the finding against Dinesh was against manifest, and Grinders was against the manifest weight of the evidence. And then we also have on the cross appeal, they're asking for additor to that. A, they're not entitled to additor because, in fact, the $300,000 that was awarded against Mr. Schaaf should be set aside as against manifest weight of the evidence. And, in fact, we should find and reverse and enter judgment in favor of Grinders and Mr. Schaaf for the amount of money that was unpaid on the non-machinery assets, the $1.293 million with the set off for the $266,000 that the defendants did pay towards those non-machinery assets. And in that transaction, which actually predates and is the first transaction at issue before the regal cutting tools, we have a situation that is, albeit unusual, we have to remind ourselves that we have Korean nationals, we have Korean companies, we have Chinese companies, we have Indian companies, we have Indian American involved in these transactions. And as a result, there are cultural differences. And I think it was evident in the trial and the testimony of all of the various witnesses, both plaintiff and defense, about the different custom and practices of how business is conducted in these other cultures. And the totality of the circumstances, I think, shows that Mr. Schaaf and his version of events are the correct and true version of events, and that the findings against him on the fraud count and the counterclaim count one are against the manifest weight of the evidence. Why do I say that? Because Mr. Schaaf testified that there was a side deal, if you will, or understanding as to the transaction. That over all these years, he dealt directly and only with Mr. Song. They had a personal relationship, and only the two of them knew the terms of their relationship. And as evidence of that, we have the testimony of Heather Lee, who is the president of Sob Tools, a wholly owned company of Mr. Song. And then we have Nancy Han, who is the president of Premier Cutting Tools, also wholly owned by Mr. Song, who both companies located in the Chicago area, both come in and testify that they're on paper only. They do what Mr. Song tells them. Nancy Han even testified that she doesn't even talk to Mr. Song. She talks to Heather Lee, who talks to Mr. Song, who tells Heather Lee to tell Nancy Han what to do. But, I mean, the bottom line is that it wasn't a conflicting testimony in all this. I mean, the jury conveyed that testimony. And I believe, of course, and they did. And I believe their findings are against the manifest weight of the evidence, because if you look at, again, the totality of the transaction, what they're arguing is that Dinesh, this is what they're saying. They're saying that he should have bought, which he did, Bessley products for $3.95 million and then resold it to the new entity, Bessley Cutting Tools, the Song entities, for $3.95 million. A net net of zero to Mr. Sheff. He makes no money. That makes no sense. That can't be the case, and it's not the case based on their customer practice of years of business and how they did transactions, where Mr. Sheff, on behalf of Grinders, would go and obtain assets, then resell them to Mr. Song or whatever entity he designated for a profit. That's how they did business. So the defense version, the secret profit they continually refer to, and they refer to it as secret because that goes into the line of cases on principal agency, which, importantly I must point out, is totally inapplicable, and again, another red herring. Why do I say that? Because the defense failed at the time of trial to present any jury instructions on principal agency. They failed to present any jury instructions. As a result, what happens? What happens is we move immediately for an oral motion to dismiss the breach of fiduciary duty count of their counterclaim. It's granted, and that issue is waived. So the continual reference to secret, again, refers to this agency relationship, which is not part of this case. There was nothing secret. It was all out in the open. The Songs attended the closing. They were there when this transaction happened. There's no question they knew at all times exactly what was happening. And regarding the aspect of $5 million for the non-machinery, for the machinery, and then $1.293 for the non-machinery assets, it's borne out by the defendant's own records, defendant's own testimony. Again, which the jury, looking at it, came to one conclusion, and we believe that conclusion is against the manifest way of the evidence. Because the defendant's own documents show that there's a loan, SOB tools, to Mr. Song. Then there's a loan from Mr. Song to Bessley Cutting Tools, the entity that is created to hold the acquired assets for $1.293, which sits on their financial statements. It sits on their tax returns. And their argument is, well, Mr. Schaaf for a period of time was in charge of Bessley Cutting Tools. He's the one that did that. Well, on cross-examination with Mr. Yang, who is the CFO for Bessley Cutting Tools, he's asked, well, did you ever amend any of your financial statements? Did you ever amend any of these tax returns to take off this wrong transaction that is booked by Mr. Schaaf? No. And it's important to point out, Mr. Schaaf is getting no compensation for his presidency of Bessley Cutting Tools. Why? As he testified, he made money in the transaction. And by making money in the transaction, he then volunteered, and Mr. Song agreed to have him help with the transition of the assets to help get all the machinery shipped over to India, to YG-1 India, to assist in all of that process. And that's why he did it at no charge. Same, exactly what he did with YG-1 India. He wasn't paid for that. But why? Because he was making money on the shipment of machines. And the fourth amendment complaint issue. Which goes really against the argument, the first argument with regard to the Beloit, in that, you know, whether there's a commission or not, I mean, they do have a practice of sometimes having no commission. Well, and I'll disagree on that, because. Well, you just told me there are at least twice. Well, and let me explain. There was no compensation, it was an added service to the transaction for which he did receive significant compensation on Bessley Cutting Tools. Regal, there was the agreement up front that I'm going to do this transaction because I'm going to make money. Then I will assist you on the backside if you want me to. If he was going to make no money on the transaction, he wouldn't at any point volunteer to also be the presidency of the company. It only is logical that because he's being paid significant dollars in the transaction, he's then willing to assist thereafter. And in YG-1 India, he was making significant dollars on the machinery being shipped over when we have the issue of, you know, the machinery being shipped over, paid by YG-1 Korea, the machinery shipped over, recondition, and those charges. The jury found in our favor on that. And the defendants, interestingly, don't raise that issue directly as an issue on appeal. What they do instead is they raise the issue that the Fourth Amendment complaint was untimely and prejudicial, which Judge McCarthy found not to be the case. And importantly, there was no surprise. A year before, December of 2009, Mr. Schaff has deposed at length about all these aspects, about reconditioning, the charges, the invoices. There's experts that are retained both by the plaintiff and the defense. Plaintiff and defense. Plaintiff has Amy Eggleston. Defense has Mary Lynn Hoffer. Mary Lynn Hoffer, their expert, rendered two reports. Not one, but two. She rendered one, and then after the deposition of the plaintiff's expert, she rendered a second opinion to try to clean up what she had said the first time. After being deposed and having so many issues in her deposition testimony, the defendants abandoned her. Abandoned her. All of the experts, this is now May of 10, months before, but all the issues, everything that's handled regarding the experts, regards to reconditioning. So, in fact, there is no surprise. What was done? What was done was to conform the plaintiff to the proof, and that's exactly what Judge McCarthy found. There's no question. He had both sides prepare charts. He took out an advisement at the beginning of the trial and said, I'm going to hold this. I want charts from both sides. I'm going to analyze it. If there's new claims, new theories, and I'm going to listen to all the evidence. And at the end of the case, if I believe that this fourth amendment complaint serves only to conform the pleadings to the proof and be proper to put before the jury as the complaint at issue, I'm going to do that. That's exactly what he did, and the record's very clear. He laid a very solid record exactly to how that was handled, and he found that it was conforming the pleadings to the proof. As a result, we find that when you look at the totality of circumstances, there's no question that the findings of the jury on the best-in-cutting tool transaction was against the manifest weight of the evidence. We ask that that be reverse remanded, and judgment entered in Dinesh's and Grinder's favor. The damages are certain. There's no question as to what they were. That the sob tools loans was against the manifest weight of the evidence, be reversed, and judgment entered for the $130,000 that's identified in our brief, as there's no evidence to the contrary. That the defendant's request as cross appellees for editor be denied. That their argument related to the fourth amendment complaint be denied. Thank you. Can you speak briefly to the issue of prejudgment? In what context? I'll strike that. Anything further? Nothing further. Anything else? Okay. Thank you. Your Honors, may it please the Court. First, with regard to the plaintiff's appeal and Mr. Sheff's claim for Broca's commission on the Regal-Beloit transaction, the very allegations of Mr. Sheff in his second amended complaint established conclusively that what was for sale was the business sought to be sold was the cutting tools division headquartered in South Beloit, Illinois. So how would you define in the statute, it talks about a company in a business. How are those terms in here should be defined? Certainly, and according to the canons of statutory constructions, they do not mean the same thing. Business is something, a corporation may have different lines of business. And in fact, this is what happened in this case. Scott Schneier, Vice President of Regal-Beloit Corporation testified at trial that Regal-Beloit Corporation itself was in a business that was very different from the business maintained by the cutting tools division that was for sale. The Regal-Beloit Corporation was in the business of manufacturing electric motors and generators. And plaintiff's counsel even asked him, so this business is very different from the business maintained by the cutting tools division, isn't it? And Mr. Schneier responded, yes, it is very different because the cutting tools division, it was a separate existing business, manufactured drills, taps, and other minor cutting tools. But didn't the Wisconsin company then just sell some assets that happened to be located in Carolina and in Illinois? Jeffrey Cummings, I believe, the lawyer who drafted the documents, transactional documents for the Regal-Beloit transaction testified that it is extremely customary in the sales of existing businesses to structure a transaction in three parts to acquire the goodwill, you know, of the business and all the intangible assets that go with existing business in one company. And here it was done with Regal-Beloit cutting tools that still exists today in Illinois and it continues the business of the cutting tools division. It manufactures the same cutting tools under the same brand name and also to form two LLCs, limited liability companies, for the purchase of the real estate assets. But as a matter of fact, it would be wasteful to return this matter for trial because the trial established that what was for sale was the cutting tools business, existing business, and everything was, you know, for sale. My clients work wiring the existing business together with employees and all intangible assets and all the goodwill, and that business is operating in Illinois right now. Well, why should the plaintiff get nothing for that transaction? Because that is the determination of the General Assembly of Illinois that established that Illinois Business Brokers Act, similar to the Real Estate Licensing Act, is a statute for protection of the consumers in Illinois. And we have the Illinois Appellate Court's decision in Thomas v. Dobbs that exactly states so. It was a determination of the Illinois General Assembly that these statutes, and the Dobbs case specifically talked about Illinois Business Brokers Act, it was designed to protect consumers that do business in Illinois from potentially fraudulent activities of unlicensed brokers. So there's a lot of cases applying the Real Estate Licensing Act expressly barring claims under quantum myriad of unlicensed brokers, even though brokers don't require anything on the transaction. In fact, none of the cases that plaintiffs cited in their briefs involve unlicensed real estate or business brokers that were able to recover under any theory. There is not a single case in Illinois that they can point in which an unlicensed broker, either real estate or business broker, was able to recover a commission under any theory. And we certainly cite the Thomas v. Dobbs case, and that's an Illinois appellate case from 97th District. And we also cite the Sandra Monroe case from the Northern District of Illinois that expressly addressed that point. So on that basis, all the cases of plaintiffs are distinguishable. And as your Honor noted, I just want to note for the record that Mr. Schaaf alleged in his own complaint in Exhibit 1 to his second amended complaint states that what was for sale was the Regal Deloitte business with a sales volume of $16 million. And he states their headquarters is located in South Deloitte, Illinois. He also alleges in Paragraph 24 of his complaint that he assisted with conducting due diligence of the cutting tools division. And the transactional lawyer explained the trial that due diligence is conducted when the business is acquired to assess how profitable and how viable a business is. So there is no, under the facts of this case, I would even posit that no statutory construction is even necessary because these are the allegations of the plaintiff himself, that what was for sale was the business. And thus, the Illinois Business Brokers Act applies to bar any of Schaaf's claims for commission, either statutory claim or the claim under quantum merit. Now, with respect to the Bezley transaction, what plaintiff, he is seeking to do, he is seeking to overturn two separate jury verdicts. One, a verdict against Mr. Schaaf on his claim that YG-1 agreed to pay $6.5 million for the Bezley plant on the very next day after learning that the Bezley plant was for sale and without engaging in any type of price negotiations with the Bezley owner. And a separate verdict that Mr. Schaaf is trying to overturn an appeal is the verdict in favor of my clients, YG-1, on our fraud counterclaim, finding that Mr. Schaaf defrauded my clients by misrepresenting the purchase price of the plant. Now, suffice it to say that there is sufficient evidence in the trial record supporting both jury liability findings. This evidence includes Schaaf's own emails falsely stating that he was paying a $1 million promissory note to James Deeds, former owner of Bezley, on top of the $3.95 million purchase price. This evidence also includes testimony of former Bezley owner James Deeds denying that he received any type of money in a $1 million promissory note from Mr. Schaaf. Mr. Deeds also testified that Mr. Schaaf specifically asked him to keep all price negotiations and the final purchase price secret from my clients. And this evidence also includes a purchase agreement duly executed by Grinders and my clients for the purchase of the entire Bezley plant for $5 million, including inventory, work in progress, raw materials, everything. And this purchase agreement contains an integration clause stating that it supersedes all prior and contemporaneous oral agreements on the same subject matter. Now, this purchase agreement is dated August 27, 2005. The alleged oral agreement with Hoki and so on allegedly took place on August 18. So at least, you know, as of the end of August, the alleged oral agreement is superseded. Besides, my clients testified at trial that despite that date, that exhibit, that purchase agreement was the final agreement that the parties signed at the end of October 2005. It just was better dated to the date of the original agreement entered by the parties before my clients made the $500,000 deposit for the transaction. And certainly, the jury was justified in crediting this testimony, and there is no reason to overturn the jury's liability findings on this point. But it's the amount that the jury awarded that you are contesting. Yes, we are contesting that amount. Can't they, can't they? I mean, the testimony was contradictory. They may not have believed everybody was testifying. Can't they pick and choose based upon what? And what other theory did the jury have? I mean, you have one theory, as I understand it, right? $1.05 million. Is that correct? Well, that was the only amount that was an evidence of the profit. Right. So there was no other. You didn't give them any alternative. There is no other alternative. There is no alternative. And that is what is ironic about the situation is that the plaintiffs never, they didn't choose to contest the amount of the profit. They only contested their liability for fraud based on the alternative version of the events. But they never introduced any conflicting alternative evidence of how the profit, once the jury found that it was a fraud, that Mr. Sheff misrepresented the purchase price, there was no conflicting evidence of that profit. None. But under your argument, shouldn't the judge have then taken away the issue of damages from the jury? Once the jury finds, what you're saying is, if the jury finds there's fraud, the amount of damages has already been determined. There's nothing for the jury to do. It was a very straightforward issue for the jury. The jury was instructed to find the amount that would compensate my clients for fraud committed by Mr. Sheff. In the closing argument, the counsel said that amount is the amount of the profit. Mr. Sheff did not contest the profit. So this is the situation in which even the judge believed when the jury returned the verdict that was a mistake. The judge thought it was a mistake because that amount that the jury came up with was inexplainable. But he didn't overturn it. So he doesn't think it's a mistake. When the jury returned the verdict, his initial reaction was that he didn't overturn it, but that was yet another procedural mistake by the judge. But what we have in the record provides, he allowed that stance. And he did give it to the jury to make a determination. So why, all you're saying is there's only one way about it, and if it's not that, I don't understand what the jury would do, you know, why you would even let it go to the jury. And that is why we believe that, you know, the issue is so straightforward, and it's almost akin to the situation in ABC transnational transport case, where this court, you know, it was a first district case. It involved a violation of duties by former employees of a business when they formed a competing business prior to leaving the company. And the judge, the circuit court judge, awarded plaintiffs, that former employer, only one third of the compensation that was paid to the breaching employees. And the court on appeal said that is wrong. Under the law, the entire compensation in that period of breach of duty should have been forfeited. And that is why there is no reason to return that case to the trial court, because the answer is clear. We have all the numbers here. But this is a fraud case, not a breach of fiduciary duty. But it is very similar. But in all the cases. But you didn't cite a case that are fraud. Well, actually, the Kirkcraft v. Weisgauer case in there, it involved, you know, that situation where the broker misrepresented the purchase price of a property in a real estate transaction. There were two claims. One was the breach of fiduciary duty. Another was consumer fraud. So it's just a different legal theory applying to the very same fact. And indeed, the agency theme was always in the case, even though it was not a separate legal claim. The witnesses were questioned at trial whether Mr. Sheff acted as an agent. There was testimony that he did. And in the closing remarks, counsel argued that he was an agent. And so it's so intertwined. You know, it's all toward, you know, common law theories of fraud, you know, agency. They're very related in the cases that we cited that establish this measure of damages in cases like this. I mean, they are just, you know, fact by fact, they fit into this situation and establish this rule. And we posit that under the Supreme Court rule 366, this court has the authority to modify the damages award when we cite the precedent. Were the court to remand it for the new trial on the issue of damages? I mean, in this last trial, plaintiffs just chose not to contest the damages amount on fraud. They were only focused on the liability. I mean, presumably they could introduce evidence of expenses, you know, that Mr. Sheff incurred in the transaction that would offset the profit. You know, I'm not quite sure what they could do. They didn't do it, and they shouldn't get the second bite of the apple. They had the opportunity, and they didn't take advantage of it. It was probably a strategic decision on their part not to contest that fraud damages amount, but they shouldn't be given the second chance. Now, and with respect to counsel's comment that Sheff was doing better transaction for free, that's not true. There is an invoice dated August 25, 2005, in which Mr. Sheff is asking for a 3% commission to grind this international transaction in the amount of $150,000. So what was Sheff seeking was $150,000, 3% commission, and there was no separate oral agreement for anything more. Now, with respect to our cross-appeal, you know, we certainly ask at the minimum a new trial on Sheff's claim involving shipments of machinery to India because of a highly irregular and prejudicial procedure by which plaintiffs were allowed to amend their complaint to allege an entirely different contractual agreement between the parties at the close of all evidence at trial. Sheff knew about all allegations from the basis of that Fourth Amendment complaint at the time of the original pleading in March of 2007 because the business relationship between the parties ended in summer of 2006, and the last shipment of machinery to India took place a year earlier in June of 2005. Yet the original complaint doesn't even contain the claim relating to shipments of machinery to India. Sheff also had multiple opportunities to amend his pleading prior to trial, and he did amend his pleadings three times in 2007, 2008, 2009, and yet all of these amendments allege a different contractual agreement. They allege agreement with YG-1 for the shipment of machinery to a subsidiary in India, and the alleged breach was YG-1's failure to pay for the actual cost of the machinery. But there was no surprise to you with regard to the Fourth Amendment complaint. The court took it under advisement at the beginning of the trial. It was determined whether the evidence that came in would be commensurate with the allegations in that Fourth Amendment complaint, and when he made that determination, that's when he had... Well, there was most certainly your only surprise, because on the very day before the case came up, before Judge McCarthy, Judge Goldberg, a motions judge who presided over the case for more than three years, didn't allow plaintiffs to amend, leave to amend, to allege this entirely new contractual agreement on the eve of trial, given defendants' vigorous objections, because defendants told Judge Goldberg, you know, if Mr. Sheff indeed intends to proceed at trial on this theory, we would need additional time for discovery. We would assert new defenses. We would plead a new answer, and given, you know, this fact, Judge Goldberg gave plaintiffs a choice. He said, you could proceed with the Fourth Amendment complaint, you know, seeking leave to amend your complaint, to allege this new contractual agreement, but you have to get a new hearing date before me, and we're going to brief it. And that was actually, that would have complied with the statute, because amendments are not as a matter of right, especially, you know, very late amendments on the very day it's set for trial. They have to be on just and reasonable terms and subject potentially to cost and continuance. Or, Judge Goldberg told the plaintiffs, you could proceed to trial right now, if you so choose, but only if you withdraw your motion and you stand on the allegation to your Third Amendment complaint at trial. So they had a choice. Plaintiffs offered Judge Goldberg, what about if we... But we're dealing with what Judge McCarthy did. So tell us what you told Judge McCarthy at the time of trial, or during trial, or before trial, as to why the amendment did not conform to the pleadings to the proof. Well, what we told to Judge McCarthy was that plaintiff's motion actually violates, you know, contravenes what the plaintiffs told to Judge Goldberg. So they contravene the prior order of another circuit court judge. But he can overrule Judge Goldberg, couldn't he? Excuse me? He can rule differently than Judge Goldberg, couldn't he? Well... Well, he can't. He can't. Obviously, yes, but usually the law is that circuit court judges in this period, you know, of courtesy and for some consistency so that litigants can reply. Now, that might be a matter of courtesy amongst judges, but that's not the law. The judge can, Judge McCarthy could do what he did, correct? He had the authority to do what he did. Yes. So how did he abuse that discretion? The discretion is abused because he failed to concede the prejudice to my client who relied on the allegations of the third amended complaint in preparation for trial. Because it alleged a completely different contractual agreement, the defense that was prepared was a different defense. The new amendment changed the nature of proof my clients were required to present at trial. If my clients knew that the alleged oral agreement for the creation of two invoices was not just an argument, it was in fact a pleading that framed the issues in discovery, framed the issues in litigation. I mean, it's no simple matter. The allegation concerned 160 machines, heavy industrial machines, located all the way in India, 150 kilometers away from Mumbai and Daman. It's a long international travel. They would have had to hire an expert to go, to travel internationally, to examine the machines, to determine were they in fact reconditioned, the extent of this reconditioning. And they would probably have to hire an expert on Indian laws and regulations to state that, to rebut the plaintiff's contention that no, you know, Indian laws and regulations did not compel reconditioning. Did you give all this information to Judge McCarthy? Certainly, it was argued to Judge, yes, it was argued to Judge McCarthy. And what he said is, give me charts and we'll proceed and then I'll make a determination at the end of the case. Yes, and so basically the judge took a wait-and-see approach that was unfair to my client at that stage in the proceeding because it effectively allowed plaintiffs to present, you know, the evidence of that alleged agreement at trial and my client was reduced to just denying it. You know, my client didn't have the opportunity to develop evidence and discover to affirmatively rebut, you know, that evidence. So the quality of proof was affected, not just the nature of the quality. And you never had an opportunity before that to take that kind of discovery because you didn't know about it? No, there was no formal amended pleading. And indeed, when Sheff, you know, first voiced that theory during his deposition, you know, defendant's lawyers pointed him out, but you didn't allege it in your complaint, did you? And the same happened when, you know, expert report of Annie Eggleston came up. During her deposition, the client said, where are those allegations in the complaint? Did you amend the complaint? So the plaintiffs were put on notice. I mean, it's a flip side to everything. They're saying that we had eight months to conduct discovery. There was a flip side that they were put on notice. They had to amend their pleadings, you know, eight months before trial. And when you actually think about it, at what point counsel has to be put to the expense, which is his international travel, you know, it's expensive discovery, new avenue of discovery, many months delays. Again, it was, you know, that first theory came up after the close of fact discovery. So it would have been, you know, reopening the fact discovery. When do defendants have to be put to this expense? Every time the plaintiff chooses to change their theory? What if my clients would have, you know, gone and reopened discovery, and they would have secured all the evidence and said that none of the machines were extensively reconditioned, and Indian laws didn't require reconditioning? And what if Mr. Sheff, without amending any complaint, would have come up with a different theory? Would my client then have to again reopen discovery, again pursue a theory? And I think the law is clear that this obligation to pursue new avenues of discovery, I mean, has to be triggered by the formal amendment of the complaint. And it's the plaintiff who is the master of amending the complaint of his plaintiffs. It's the plaintiff who decides on which issues he's presenting evidence at trial. You know, it was not up to my client. So we certainly believe that, especially given the appellate court's rulings in Gray v. City of Plano, in the Stringer construction, it was a reversible error here, highly prejudicial, to allow that very late amendment after the close of all evidence, you know, at trial. And the court, you know, in City of Plano, it actually goes far as to say that the fact that defendants had two years to conduct the additional discoveries immaterial, because it was up to plaintiff at every single point to define the issues in discovery. And if we consider those two burdens that were considered, was it burdensome for plaintiff to amend his pleading prior to trial, to allege that oral agreement? And I would posit no, it was not burdensome at all, because they knew about all the facts before they filed the initial complaint, and yet they didn't allege that oral agreement, versus the burden on my client to be in a situation where, you know, after the close of discovery, my client has one night to draft a new response of pleading, to assert new affirmative defenses, to come up with a new set of jury instructions completely. One night on the eve of closing arguments in the case, and it was a small firm out of Wheaton, you know, with very few lawyers. It was not a general block defending clients at trial. It was extremely prejudicial, and I would say, yes, amendments usually are allowed liberally, but in this particular case, it was highly prejudicial. It was an irregular procedure. So, thank you. If the client is allowed, I would like just a couple of minutes of paper. Just a record at the time, our firm was about 10% the size of Hope, so I don't think the size of the firm matters to any of the issues in this case. Regarding the last point about Judge Goldberg, there's no record of what happened in front of Judge Goldberg. Putting that to the side, when should that allegation have been made? They're saying they were really sandbagged by what happened, because they never had an opportunity to take the discovery that would have been appropriate in order to rebut in that at least two discovery points that it came up, and yet you didn't amend, and I think the argument was six months or more before trial. So, why should we allow that to proceed? Two points. One, the expert report and deposition of the expert, Amy Eggleston, which was taken on May 19, 2010, which is 2295 in the record, where her entire expert report identifies the issues and what her opinions are, and her opinions related to the reconditioning and whether or not invoices were duplicative or not. But you don't have it in the complaint. If it's not in the complaint, why should they go to the expense of doing anything about it? They even hired their own experts on those same points. Why didn't you amend before? The point you're saying is why everybody knew about it. At the time we felt it was appropriate. We did exactly what we were supposed to do, filed a motion to amend. Judge McCarthy reviewed all the materials. He listened to all the positions of the parties, and at the end said, I'm confirming that the plea is approved. Everyone in this case has known exactly what the issues are. I've looked at all the materials. There's nothing new here. There's no new theories. So what you're saying is, as I understand it, when counsel argued, well, this came as a surprise in that they really didn't know you were going to proceed on the basis of the Indian transaction. That's not true. They knew exactly. In fact, they had an expert prepared, and they didn't need to send somebody to India to look at the machines at that time. There was nothing. This all came out through discovery, and there's no reason why Judge McCarthy couldn't have conducted the hearing with regard to amending the complaint the way he did. Absolutely. And the most emphatic part of that is where they had their own expert who wrote two reports on these very topics of which they complained about. And regarding having to travel to India, they own the company in India. They're employees. Nobody has to travel. Somebody has to walk somewhere in the locale of the plant should they had to have done that, which they didn't do. So I emphatically say that they were on notice. Everyone was on notice. Confirmed the plea is approved. There were no new theories whatsoever, and in fact, Judge McCarthy found them, and he allowed both sides to present charts, and we had argument. And at the end of the trial, he said, I've listened to everything. I've looked at the charts. There's nothing new here. Everyone knew exactly what was happening, knew what the issues were, knew what the claims were, and let's proceed. Regarding the purchase order and asset purchase agreement for Besley, the argument being that there was a written purchase agreement that was in place which clearly identified the assets being purchased, being sold by Grinders, purchased by Besley Cutting Tools, BCTI, the new co-acquiring company, is just entirely not accurate. I mean, the evidence is very clear that at one point Mr. Song asked for a written agreement because he needed that to show his accounting department and for customs purposes to wire the deposit of $500,000. Thereafter, defense-owned employees request, and there's an email to it, Isaac Yang of YG-1 Korea, physically sends an email, tear it away. In his testimony, he said, tear it away means it was no good. We were changing mechanics. We were doing this, doing that. Thereafter, they can produce no other document dated other than that August 27th date. Now, they allege, oh, we just backdated another one. Well, that never was produced as different signatures. There's no indication in the record that that actually did happen. And, in fact, there is no other written agreement that they could produce. They reference several during the course of the trial. They can produce no other document. Why? Because the only other document that exists is the $5 million purchase order. That's the only other document. They say, oh, it's a one-page document. You can't pay attention. A $5 million deal for a $330 million company, one page. What they forget is the exhibit to that one page. The exhibit to that one page is a 15-page itemized spreadsheet, machine by machine, serial number, and putting the value to each and every one of those machines, which in totality is $5 million. So the fact that there was at one point this purchase agreement, they agree at some point that that wasn't the one that was in place. They can produce no other, and all we have is the $5 million purchase order, which we believe shows that the jury verdict was against the manifest weight of the evidence, given that the $5 million purchase order is the only written agreement between the parties. And the position of the cross appellees here that there was no contesting of the fraud is just not accurate. Our position was not only was there not any fraud, but we were entitled to the balance of the $1.293 million that we didn't get paid for the non-machinery assets. We put on our position, which is direct opposite and contradictory to their position that there was fraud. So inherently by presenting our position on that, it's disputing their position that this was fraud. So to say that we didn't dispute anything, we didn't dispute the damages, it's just not accurate. That's exactly what we did. We said we were entitled to more money, they're entitled to nothing. So to say that we didn't dispute that is entirely not accurate. So the jury could have come out with whatever, the $300,000? Right. And lastly, counsel cites to the Kirkcroft case regarding the Brokers Commission issue, and I just want to point out that that was a Rule 23 opinion, which states clearly that it's not for use in citation or can be used for any persuasive purpose whatsoever. So we would ask that we set aside any discussion or argument on Kirkcroft, given that it's a Rule 23 opinion. Thank you. Thank you. Helen. With respect to Kirkcroft, I'm pretty sure it's a presidential, so I would urge this Court to double-check that statement. Probably do it myself. With respect to shipments to India and the late amendments. Did you have an expert? There was no expert. The expert, as an initial matter, none of this information is in the record on appeal. So it's not, you know, it's not a proper subject of discussion, you know, on this level. But just as a factual matter, defendant's expert was not even like an opening expert. It was a rebuttal expert to our expert. So what the expert defendants initially hired was to address the allegation of the third amended complaint that our clients failed to pay for the actual cost of the machinery shipped to India. The expert was asked to analyze the financial records of YG-1 Korea and the expert proffered opinion before trial that based on all the documentation, my clients did pay for the actual cost of the machinery shipped to India. Then the plaintiffs introduced that new theory about reconditioning. And there was no expert on our part hired to rebut that theory because that theory was really an argument at that stage. It was not a proper pleading and indeed this is what we argued to Judge Goldberg and to the trial judge that if the plaintiffs' new allegation regarding that new contractual agreement was their theory, you know, was their formal pleading, we would have to go and hire an expert to rebut that theory. There was no expert hired to rebut those allegations. Now in terms of no surprise, that is not the exact legal standard. The standard is whether the late amendment subjects defendants to surprise or prejudice. And so there is this disjunctive or. We were prejudiced because we were not given the opportunity to develop evidence in discovery to rebut their very late amendment. And in terms of that procedural error that is reversible error was amplified in our opinion by the court's erroneous admission of the late amendment. In this matter, she conceded that she is no import-export expert, no expertise at all. She did not see the statement of contracts that allegedly formed the basis of her testimony that there was an oral agreement for the creation of two invoices. There was no documentary basis for anything she said and she conceded that she learned about the Indian laws and regulations only in this case from Mr. Sheff and documents that he supplied. So the materials on which she relied, they did not have indicia of reliability. They were not trustworthy. And the court should have never allowed Ms. Eggleston, and she is a certified fraud examiner, but on this particular topic she had no expertise, no knowledge any greater than any late juror would. And she was not a lawyer or professor on Indian law and regulations. She should not have been allowed to introduce that testimony. And so it was a credibility contest in the sense between Mr. Sheff, who was saying there was an oral agreement, and our clients saying there was an oral agreement for the creation of two invoices. And we had Ms. Eggleston, who was a certified fraud examiner with 25 years of experience, who was a tiebreaker in the contest, basically as a mouthpiece for Mr. Sheff, giving credence to his theory. And the combination of these two procedural errors, when my client was deprived of the opportunity to develop that affirmative evidence, there was no reconditioning, there was no oral agreement, coupled with incompetent expert testimony by Ms. Eggleston on these two subjects, those two procedural errors really combined to deny a fair trial to my client. And so we do seek a new trial on this claim. Thank you, Your Honors. Thank you. We'll take the matter under advisement, and you'll be hearing from the court. Thank you.